IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DJURO G. ZRILIC,

      Plaintiff,

vs.

BOARD OF REGENTS FOR NEW
MEXICO HIGHLANDS UNIVERSITY;
and MANNY ARAGON; JANICE
CHAVEZ; PLACIDO GOMEZ;
CELESTINO MENDEZ; HOSSEIN
TAHANI; ROLANDO RAEL; and E. R.
GREENE, in their official and individual
capacities,

      Defendants.

No. 07cv416 PK/RLP

---

MEMORANDUM OPINION AND ORDER

---

THIS MATTER comes on for consideration of Defendants' Motion for Summary

Judgment filed June 30, 2008 (Doc. 107).  Upon consideration thereof, the court finds that

the motion is well taken and should be granted.

<u>Background</u>

Plaintiff Djuro G. Zrilic is an ethnic Serb, who was born and raised in the former

Yugoslavia, and became a United States citizen in 2002.  He was hired by New Mexico

Highlands University ("NMHU") as a visiting professor on November 1, 1991, promoted

to associate professor on May 27, 1997, and awarded tenure on November 11, 1997.

Plaintiff has been continuously employed with NMHU in the College of Arts and Sciences since 1991.

On July 10, 2006, Plaintiff filed a typewritten Charge of Discrimination with the New Mexico Department of Labor, Human Rights Division ("HRD"), and the Equal Employment Opportunity Commission ("EEOC"), claiming that NMHU has discriminated against him on the basis of retaliation and national origin since May 31, 2006, and that the discrimination is ongoing.  Doc. 107, Ex. 1 ("EEOC/HRD Charge"). Plaintiff also alleged that NMHU pays him a salary below that of his colleagues.  Id. Plaintiff later submitted additional information to the HRD and, on the basis of that information, the HRD issued a Determination of Probable Cause on February 1, 2007. Doc. 113, Ex. A.  Following receipt of the Determination of Probable Cause, NMHU adjusted Plaintiff's salary, but Plaintiff maintains that even after the adjustment, his salary remains below that of one of his colleagues.  Doc. 1 at 12.

On April 27, 2007, Plaintiff brought this action, seeking compensatory and punitive damages from Defendants.  The theories are as follows:

• Count III - Title VII national origin discrimination.

• Count IV - New Mexico Human Rights Act - national origin discrimination.

• Count V - Title VII, wrongful retaliation.

• Count VI - 42 U.S.C. § 1983 claims for violation of equal protection and due process rights guaranteed under the Fourteenth Amendement and similar claims under Art. II, section 18 of the New Mexico Constitution.

•     Count VII, 42 U.S.C. § 1985(3) civil conspiracy.

Supplemental state law claims in other counts for intentional infliction of emotional distress (count VIII), negligent hiring, retention and supervision (count IX), and prima facie tort (count X), have been dismissed on Defendants' motion. See Doc. 131. The Title VII claims only run against the employer; and those claims would have to be dismissed as against the individual defendants. Haynes v. Williams, 88 F.3d 898, 900-01 (10th Cir. 1996).

### Discussion

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In applying this standard, the court reviews the evidence in the light most favorable to the nonmoving party. Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008). At the same time, Plaintiff must go beyond the allegations in the complaint and come forward with significantly probative evidence that would support a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1985); see also D.N.M. LR-Civ. 56.1(b).

A.     Plaintiff's Hostile Work Environment Claim–Counts III and IV

Defendants seek summary judgment on Plaintiff's Title VII and NMHRA claims to the extent they are based on a hostile work environment theory. Administrative remedies must be exhausted before bringing suit under Title VII or the NMHRA.

3

Ara{m}buru v. Boeing Co., 112 F.3d 1398, 1409 (10th Cir. 1997) (Title VII); Mitchell-Carr v. McLendon, 980 P.2d 65, 71 (N.M. 1999) (NMHRA).  Doing so places an "employer on notice of a violation prior to the commencement of judicial proceedings" and "facilitate[s] internal resolution of the issue rather than promoting costly and time-consuming litigation."  Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).  The failure to file an administrative claim before bringing suit is jurisdictionally fatal. Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997); see Mitchell-Carr, 980 P.2d at 71 ("[A] failure to exhaust administrative remedies [under the NMHRA] may mean that the district court lacks subject-matter jurisdiction.").

To determine whether Plaintiff exhausted his administrative remedies, the court first examines whether he filed a charge of discrimination with the EEOC.  Jones v. United Parcel Service, Inc., 502 F.3d 1176, 1183 (10th Cir. 2007).  Plaintiff did so on July 10, 2006.  Doc. 107, Ex. 1.  Next, the court determines "the scope of the allegations in the EEOC charge because a plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  Jones, 502 F.3d at 1186 (brackets and internal quotation marks omitted).  Administrative charges of unlawful employment practices are regularly completed by employees without benefit of counsel.  Given this circumstance, and the notice function of the charges, liberal construction is warranted. See Jones, 502 F.3d at 1186; see also Deravin v. Kerik, 335 F.3d 195, 200-01 (2d Cir.

2003).  However, "the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim."  Jones, 502 F.3d at 1186.

Defendants argue that the Plaintiff's charge to the EEOC/HRD is void of any factual allegations reasonably related to a hostile work environment claim.  Plaintiff acknowledges that he must exhaust his administrative remedies prior to filing an action in federal court and argues that an exception to exhaustion applies.  He argues that his hostile work environment claim has been exhausted because it arises from the same common nexus of alleged facts as his national origin discrimination and retaliation claims.  The court concludes that Plaintiff's national origin and retaliation claims, as indicated on his charge, could not reasonably be expected to lead to a hostile work environment claim.

The starting point for this analysis is the language of the charge itself.  The form contains sections with boxes that may be checked or blanks that may be filled in by the complainant.  In the section entitled "Cause of discrimination based on," Plaintiff checked the boxes marked "Retaliation" and "National Origin."  Doc. 107, Ex. 1.  In the section entitled, "Date discrimination took place," Plaintiff typed "05-31-06" and checked the box marked "Continuing action."  Id.  Finally, in the section provided for the "Particulars," Plaintiff stated:

> I.  Statement of Harm:  I was hired on November 01, 1991.  On May 18, 2005 I was placed on Administrative Leave while an investigation was conducted for allegations of mismanaging funds.  On August 18, 2005 I was reinstated.  At the beginning of November 2005 the first meeting was held at which time I requested the leveling of my salary with the salary of my

colleagues.  As of May 31, 2006 I have not received any adjustment to my salary.

II.  Respondent's Reason for Adverse Action:  None given.

III.  Statement of Discrimination:  I believe that I have been discriminated against because of my National Origin (Yugoslavian), and in retaliation, in violation of Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act.

Id.

Even reading Plaintiff's EEOC/HRD charge liberally, it is clear that the form makes *no mention whatsoever* of any offensive comments or behavior based on his national origin.  Although Plaintiff is not required to label his claim with the legal term "hostile work environment," he must allege *some* facts which might indicate a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted).  Plaintiff does not allege even one such fact—Plaintiff's charge to the EEOC does not even hint at a hostile work environment claim, notwithstanding that he now maintains that he has been subjected to such an environment since 1991 and indeed threatened to take legal action against the University based on "statements and administrative actions which appear discriminatory, harassing and humiliating" over a month before the charge, Doc. 113, Ex. S (5/30/2006 minutes).  See Mitchell v. City and County of Denver, 112 F. App'x 662, 667-68 (10th Cir. 2004)

6

(unpublished) (holding that plaintiff failed to exhaust administrative remedies where nothing in EEOC charge indicated a hostile work environment).

Plaintiff argues that by checking the boxes for discrimination based on national origin and retaliation and the box for continuing action, he effectively made a designation that reasonably relates to a hostile work environment claim.  For this proposition, he relies on Anderson v. Clovis Mun. Sch., 265 F. App'x 699, 706 (10th Cir. 2008) (unpublished).  However, in Anderson, the plaintiff did more than just check boxes—he stated that, on a continuing basis, he had been "subjected to adverse terms and conditions unlike my peers."  Id.  The Tenth Circuit concluded that this statement, coupled with checking the box on the EEOC form for racial discrimination, sufficed to show a hostile work environment claim.  Id.  Here, Plaintiff alleged *no facts* explaining how he has been subjected to a hostile work environment.  Rather, the charge merely indicates that Plaintiff was placed on administrative leave, was reinstated, and requested a salary adjustment which he did not receive.

Finally, Plaintiff argues that he has exhausted his administrative remedies because the HRD's Determination of Probable Cause includes statements sufficient to put Defendants on notice that Plaintiff may raise a hostile work environment claim.  The Determination of Probable Cause states that Plaintiff had informed the HRD that he had been "subjected to racial slurs by peers" and that "[a]t least 2 witnesses support [his] contention that [he was] harassed and that racial slurs are regularly used by staff."  Doc. 113, Ex. A. at 1-2.  On the basis of these statements, Plaintiff claims that the HRD

"reasonably contemplated a hostile work environment claim" and as such, Defendants have not been prejudiced by this action.  Doc. 113 at 11.  The contention is not persuasive.

First, the HRD did not make a probable cause determination on the basis of a hostile work environment claim.  Indeed, the HRD Determination of Probable Cause expressly states that it is "issuing a PROBABLE CAUSE determination on the basis of National Origin and Retaliation."[1]  Doc. 113, Ex. A at 2.  Second, the statements provided by Plaintiff to the HRD do not show that Plaintiff's charge would have reasonably led to the discovery of a hostile work environment claim.  Rather, these statements essentially are another charge in themselves.  Finally, to conclude that Plaintiff exhausted his administrative remedies by providing such supplemental information to the HRD would subvert the purpose of the rule.  Plaintiffs are required to exhaust their administrative remedies prior to instituting suit in federal court to foster conciliation through the administrative process and give potential defendants an opportunity to avoid litigation. Martinez, 347 F.3d at 1211.  Although Defendants were informed of HRD's findings, there is no evidence that they were provided an opportunity to investigate or respond to Plaintiff's claims before that point; indeed, Defendants maintain that the civil complaint

---

[1] The court will not defer to a probable cause determination issued by the HRD, nor on other issues that the Plaintiff argues were implicitly decided by the probable cause determination.  See Colon-Sanchez v. Marsh, 733 F.3d 78, 83 (10th Cir. 1984) ("We have declined to hold that formal EEOC determinations are entitled to [deference]; rather, their value rests within the discretion of the trial judge."); Nulf v. International Paper Co., 656 F.2d 553, 563 (10th Cir. 1981) ("Trial courts have discretion in deciding whether to admit EEOC determinations into evidence and refer to them in their findings.").

in this matter provided that information.  Doc. 121 at 13-14.  Accordingly, the court

grants Defendants' summary judgment on Plaintiff's claims to the extent they encompass

a Title VII/NMHRA hostile work environment claim for failure to exhaust administrative

remedies.

        B.      Statutory Time Period for Bringing Disparate Treatment Claims under Title
               VII and NMRHA

Defendants argue that the only discrete act of alleged discrimination that may not

be time barred is the denial of Plaintiff's November 2005 request for a salary adjustment.

A charge of employment discrimination must be filed within 300 days after the "alleged

unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); see N.M. Stat. 28-

1-10(A) (time bar of 300 days under the NMHRA).  An unlawful employment practice

refers to a discrete act even if connected to other acts, and a claim regarding that discrete

act is time barred if filed outside of the 300-day time limit.  Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 110–11 (2002).

Defendants argue that only three discrete acts were included in the EEOC charge:

(1) Plaintiff's placement on administrative leave on May 18, 2005; (2) Plaintiff's

reinstatement on August 18, 2005; and (3) the denial, as of May 31, 2006, of Plaintiff's

request for a salary increase in November 2005.  Plaintiff filed the EEOC charge on July

10, 2006.  The 300-day time limit precludes all conduct prior to September 13, 2005, so

the only remaining claim is the request for the salary increase in November 2005.

Plaintiff argues for a much broader approach—all these acts (indeed, acts spanning his employment at NMHU) are applicable as part of a hostile work environment claim. Where one of the acts complained of in a *hostile work environment claim* falls within the 300-day limitation period, it may be possible to rely upon other acts outside the period where such acts are sufficiently related to the hostile work environment claim within the limitation period. <u>Morgan</u>, 536 U.S. at 115–17; <u>Tademy v. Union Pac. Corp.</u>, 520 F.3d 1149, 1160-61 (10th Cir. 2008). However, as previously discussed, Plaintiff did not exhaust his administrative remedies on his Title VII/NMHRA hostile work environment claim. Accordingly, a hostile work environment theory is not available and a "continuing violation theory" does not apply for discrete acts of alleged discrimination—those discrete acts must be within the limitation period and exhausted.[2] <u>See</u> <u>Annett v. University of Kan.</u>, 371 F.3d 1233, 1238 (10th Cir. 2004); <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (applying <u>Morgan</u> to incidents occurring after the filing of the EEOC charge); <u>Ulibarri v. State of N.M. Corrs. Academy</u>, 131 P.3d 43, 47-48 (N.M. 2006). Plaintiff also argues that because the charge form still referenced "continuing action" as an available basis in July 2006, the form is ambiguous and the court should not interpret the form to deprive him of a valid substantive claim. This invests the "continuing action" box with a significance far beyond what is apparent, but apart from

---

[2] Plaintiff points out that acts prior to the 300-day period may be used as "background evidence" supporting a timely claim under <u>Morgan</u>, Doc. 113 at 13, the Tenth Circuit has interpreted this exception narrowly, lest the exception swallow the rule that untimely discrete claims are not actionable. <u>Haynes v. Level 3 Comms., Inc.</u>, 456 F.3d 1215, 1223 (10th Cir. 2006).

that, an administrative agency's form cannot create an exception to Supreme Court precedent.  Finally, Plaintiff argues that the time period should be tolled because when he complained to the Highlands Human Resources employees and to his department chair, he was either told to "ignore it and do his job" or that it would be investigated.  Like statutes of limitation, the time period for filing is subject to waiver, equitable tolling, and estoppel, but these remedies are to be applied sparingly.  Morgan, 536 U.S. at 113. Plaintiff's argument fails because he does not show how the Defendants' actions he cites actively deceived him or caused him to be unaware of his ability to bring a claim.  See Bennett v. Coors Brewing Co., 189 F.3d 1221, 1235 (10th Cir. 1999).  Accordingly, the court grants summary judgment to the Defendants vis-a-vis any unexhausted and/or untimely discrete acts of discrimination urged as a basis of recovery.[3]  See Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162, 2168 (2007) ("A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977))).

    C.  Denial of Salary Increase Requested in November 2005

---

[3]  It bears noting that Plaintiff also maintains that evidence of a hostile work environment occurred within 300 days of the filing of the EEOC/HRD dealing with course staffing, approval of reimbursement requests, student advisement, and the adequacy of facilities and equipment.  Doc. 113 at 22-23.  Without deciding whether these events constitute adverse employment actions, they are discrete acts for which no EEOC/HRD charge, timely or otherwise, was filed.

Defendants essentially contend that Plaintiff cannot prove his pay discrimination claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1985). According to the complaint, Plaintiff maintains that "on a continuing basis since his hire [in 1991]" he is paid less than similarly situated professors, particularly non-tenured and tenured professors that have not attained the rank of full professor. Doc. 1 at 5, ¶ 24. In his summary judgment response, Plaintiff contends that "[t]he evidence adduced in discovery reflects that between 2005 and 2006, Plaintiff was consistently paid from $8,000 to $10,000 less in base salary than Defendants Greene and Tahani. Plaintiff also was paid less than Gil Gallegos, a non-tenured professor who was hired in 2005." Doc. 113 at 16-17. He contends that the University unilaterally adjusted his salary upon receipt of HRD investigation results, but he is still paid less than others. Doc. 1 at 12, ¶ 59. As discussed below, in 2007 the University retroactively equalized his base salary in 2005-2006.

As an initial matter, Ledbetter has particular relevance to this case. In Ledbetter, the Supreme Court reaffirmed that earlier, allegedly discriminatory decisions not within the 300-day charging period cannot be the basis of Title VII pay discrimination claims, notwithstanding that those earlier decisions have an effect on current pay. Ledbetter, 127 S. Ct. at 2169 ("The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination."). The "discrete act" is "pay-setting" and "the period for filing an EEOC charge begins when the act occurs." Id. at 2165; see also

12

Del. State College v. Ricks, 449 U.S. 250, 258 (1980).  When a subsequent act alleged to

be discriminatory occurs, say after the initial charge, an employee must file a new charge.

Ledbetter, 127 S. Ct. at 2169 ("Ledbetter should have filed an EEOC charge within 180

days after each allegedly discriminatory pay decision was made and communicated to

her.").  According to Mr. Gomez, the then Vice-President for Academic Affairs, in

November 2005, Plaintiff only demanded that his salary be equalized to that of Dr.

Greene, a professor with a joint appointment to two departments, Doc. 1 at 3, ¶ 12.  Mr.

Gomez "told Dr. Zrilic that Dr. Greene had additional responsibilities other than his

teaching."  Doc. 107, Ex. 12 at 30.  In his deposition, Mr. Gomez recalled that the

additional responsibilities were being coach of the rugby team.  Id. at 30-32.  He thought

the supplemental amount was $7,000, but he did not know.  Id. at 32.

Plaintiff provides the deposition testimony of Dr. Joseph Sabutis, who testified that

Plaintiff requested that his salary be put at the same level as Dr. Greene and Dr. Gil

Gallegos, a new hire,[4] and that Mr. Gomez denied the request in the presence of a NMHU

administrator, Manu Patel.  Doc. 113, Ex. F at 77-80.  Dr. Sabutis also testified that Mr.

Gomez explained the salary differential between Plaintiff and Dr. Greene as attributable

to coaching rugby, and that Dr. Sabutis thought the explanation improper because Dr.

_____

[4]  It is undisputed that Dr. Gallegos was hired for a position that advertised a salary of
$65,000-75,000.  Doc. 107 at 8, ¶ 23; id., Ex. 2 at 226.

13

Greene would only receive "a couple of thousand dollars" more for a supplemental contract and Dr. Greene's base salary was higher than Dr. Zrilic's.  Id. at 79-80.[5]

Plaintiff maintains that Mr. Gomez could not adequately explain why Dr. Greene had a higher salary than Plaintiff in July 2005-2006, even after taking into account a $7,000 supplemental payment.[6]  Doc. 113 at 6 (response to undisputed fact 44).  The spreadsheet containing the 2005-2006 salaries relied upon by the Plaintiff for that period does not contain the salary (base or supplemental pay) of Dr. Greene; however, the base and supplemental pay appears to be $68,000, and $5,833 respectively.[7]  Doc. 113, Ex. Q, Fiscal Year 2005-2006 (spreadsheet reporting salaries by Department-Math, Engineering and Computer Science); Doc. 113, Ex. X; Doc. 107, Ex. 5, ¶ 4.  It does indicate the following:

---

[5]  Of course, Dr. Sabutis's opinion on the value of the worth of Dr. Greene's services as a rugby coach is irrelevant.

[6]  The $7,000 figure may be for subsequent years.  See Doc. 107, Ex. 5, ¶ 4 (supplemental rugby pay $5,833).  Defendants argue that the fact that Mr. Gomez may have been mistaken about the size of the supplemental pay does not matter for Title VII does not protect against decisions based on incomplete information, just discriminatory ones.  It is unnecessary to address this argument.

[7]  Although Plaintiff's counsel asked Mr. Gomez if he was aware that in August 2005 (2005-2006), Dr. Greene had received a salary increase from $57,000 to $68,000, Mr. Gomez responded that he was not aware and that August 2005 was previous to his employment at the school.  Doc. 113, Ex. P at 109.

| Employee | Department | Title | 2005-2006 Base | 2005-2006 Supplemental Pay |
|---|---|---|---|---|
| Gallegos, Gil | Engineering | Ass't | $64,000[8] | |
| Tahani, Hossein | Computer S | Ass't | $68,000 | $12,083 |
| Zrilic, Djuro | Engineering | Assoc. | $57,414 | $12,509 |

Doc. 113, Ex. Q, Fiscal Year 2005-2006.

A spreadsheet for the prior year (fiscal year 2004-2005) reveals the following:

| Employee | Department | Title | 2004-2005 Base | 2004-2005 Supplemental Pay |
|---|---|---|---|---|
| Greene, Ernest | Engineering | Prof.[9] | $54,805 | $15,587 |
| Tahani, Hossein | Computer S | Ass't | $56,450 | $13,665 |
| Zrilic, Djuro | Engineering | Assoc. | $56,203 | (no data) |

Id., Fiscal Year 2004-2005.

After 2005-2006, the salaries became more uniform.  According to the University president, the 2006-2007 salaries are as follows:

| Employee | 2006-2007 Base | 2006-2007 Supplemental Pay |
|---|---|---|
| Gallegos, Gil | $71,060 | $1,399 |
| Greene, Ernest | $71,060 | $7,321 |
| Tahani, Hossein | $71,060 | $14,389 |
| Zrilic, Djuro | $59,998/$71,060 | $19,865 (summer 2006/2007) |

Doc. 107, Ex. 5 at 2 ¶¶ 7-10.

---

[8]  The salary is probably $68,000.  Doc. 107, Ex. 5 at 1, ¶ 3.

[9]  Dr. Greene is a professor.  Doc. 1 at 3, ¶ 12.

15

In March 2007, the university president authorized a retroactive adjustment to Plaintiff's salary for 2005-2006 and the first half of 2006-2007 to $68,000; Plaintiff's base salary was raised to $71,060.  Id. at 2, ¶ 10. Currently, the salaries are:

| Employee | 2007-2008 Base | 2007-2008 Supplemental Pay |
|---|---|---|
| Gallegos, Gil | $73,192 | (no data) |
| Greene, Ernest | $73,192 | $7,320 |
| Tahani, Hossein | $73,192 | (no data) |
| Zrilic, Djuro | $73,192 | $15,047 |

Id. at 3, ¶¶ 11-14.  These four are the highest paid tenure and tenure track faculty at the University.  Doc. 107, Ex. 5 at 3, ¶ 15.

Even assuming that Plaintiff's salary was lower for 2005-2006 (before it was retroactively increased) than the salaries of a self-selected group of other members of the department, the summary judgment evidence indicates that the "pay-settings" in this case which Plaintiff complains of are outside the 300-day limitation period.  While the Court in Ledbetter suggested that denial of a raise alleged to be discriminatory within the 300-day period was actionable (as would be succeeding payments thereafter to the date of the charge), see Ledbetter, 127 S. Ct. at 2167, that is not what is before the court.  Instead, Plaintiff complains about a process which apparently sets faculty pay at the time of hire and annually (amounts entered in August 2005, Doc. 113, Ex. X, Mendez email of 8/22/2005; 12:10 pm) thereafter.  The issue is whether a unilateral employee request for equalization to correct prior alleged discriminatory decisions can render those decisions

timely as part of the request.  Such an approach would amount to an end-run around Ledbetter where the facts and relief sought are identical in both situations.  Plainly, Ledbetter and Title VII's short limitations period cannot be circumvented by a unilateral employee request that is no more than an effort to recover for events that are unexhausted and would be time-barred.

Regardless, even if the initial denial of the request for equalization of salary was not time-barred, and taking the evidence in the light most favorable to the Plaintiff, summary judgment should be granted to the Defendants on the Title VII and NMHRA pay discrimination claims (counts III and IV).  Plaintiff has no direct evidence that the initial denial of his request to make his salary equal to that of Dr. Greene or Dr. Gallegos was discriminatory, and suggests the indirect method of proof.  Doc. 113 at 16-17.  To make out a prima facie case of discrimination under Title VII, the Plaintiff may show (1) membership in a protected class, (2) an adverse employment action, and (3) disparate treatment among similarly situated employees.  See Trujillo v. Univ. of Colo. Health Sci. Ctr., 157 F.3d 1211, 1215 (10th Cir. 1998).  If the Plaintiff meets his burden of proving a prima facie case, the burden shifts to the Defendant to provide a legitimate, nondiscriminatory reason for the employment action.  Id.  If the Defendant does so, the burden shifts back to the Plaintiff to show that the legitimate reasons offered by the Defendant were not its true reasons, but were pretextual.  Id.

While Plaintiff is in a protected class, and assuming that the denial of the request for equalization with colleagues could be an adverse employment action,[10] Plaintiff has not demonstrated that he is similarly situated such that any 2005-2006 raise should have been applied equally.  Although the burden on the prima facie case is light, and although the university apparently decided to equalize the base salaries of the group later, Plaintiff must develop *some* evidence of comparability concerning the level of responsibility and tasks performed, e.g. research, teaching and/or service.  Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002) (stating that a similarly situated employee is one "directly comparable to [the Plaintiff] in all material aspects.").  While an institution certainly may pay the same base salary to all, it was incumbent upon the Plaintiff to shed some light on the process (perhaps evidence of past practice) and show he was similarly situated.  For example, it is undisputed that in 2005-2006, Dr. Greene was assigned to biology (55%) and engineering (45%), and Dr. Gallegos was a new hire that apparently earned more before.  Doc. 107 at 9, ¶ 32; Doc. 113, Ex. D (Greene email of 8/20/2005, 4:51 pm).  Moreover, it appears that in advocating setting Dr. Greene's salary at $68,000 in 2005, Dr. Mendez considered Dr. Greene's publication record and multi-disciplinary background, as well as Dr. Gallegos's great promise, in addition to academic rank.  Doc. 113, Ex. X (Mendez email of 8/22/2005, 12:10 pm).  In a department which apparently

---

[10]  The fact that the University acceded to Plaintiff's demands for salary equalization and made a retroactive award does not preclude his claim.  Crawford v. Carroll, 529 F.3d 961, 971-72 (11th Cir. 2008).

comprises many disciplines, academic ranks and hire dates, the burden is on the Plaintiff to provide evidence that he is similarly situated.  See Keri v. Bd. of Trs. of Purdue Univ., 458 F.3d 620, 626, 644-45 (7th Cir. 2006).

> D.     Retaliation Claim under Title VII

Defendants argue that they are entitled to summary judgment on the Title VII retaliation claim (count V) because Plaintiff has failed to establish a prima facie case of wrongful retaliation and because the alleged retaliation falls outside the 300-day time limit.  Doc. 121 at 20; see also Doc. 107 at 30-32.  Plaintiff contends that he may rely upon informal complaints and that in April or May 2005, he reported to Marion Steward his concerns about curriculum, hiring of faculty, and the possible expenditure of grant funds.  Doc. 113 at 26.  Following this report, Plaintiff alleges that he was placed on administrative leave for three months and reinstated after an unnecessary, additional month delay.  As previously discussed, conduct occurring outside the 300-day time limit cannot form the basis of a discrete act claim—the alleged retaliation occurs prior to September 13, 2005, and is time-barred.  See Maldonado v. City of Altus, 433 F.3d 1294, 1308 (10th Cir. 2006), overruled on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006); Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir. 2004).

Plaintiff also fails to state a prima facie case of retaliation which requires, "(1) the plaintiff engaged in protected opposition to discrimination; (2) the plaintiff suffered an adverse employment action; and (3) there is a causal connection between the protected

activity and the adverse employment action." Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004) (quotations omitted).  None of the conduct relied upon by the Plaintiff in his response to the motion for summary judgment, complaining about curriculum, hiring, or grant funds, is protected opposition to discrimination.  As a consequence, Plaintiff fails to state a prima facie case of retaliation.[11]  Because Plaintiff is time barred on his retaliation claim and did not identify a protected activity opposing discrimination, Defendants are entitled to summary judgment on this claim.

E.  Eleventh Amendment Immunity–§ 1983 claims

Defendants have raised the defense of Eleventh Amendment immunity in the context of urging qualified immunity.  Plaintiff concedes that the § 1983 claims for damages running against the Board of Regents are barred by the Eleventh Amendment as a suit against the State, as are the § 1983 claims for damages against the individual defendants in their official capacities.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71 (1989) (State or state officials acting in their official capacities are not persons within the meaning of § 1983); Buchwald v. Univ. of N.M. Sch. of Med., 159 F.3d 487, 494 n.3 (10th Cir. 1998); Doc. 113 at 31 (Plaintiff's concession).  The § 1985(3) claim for damages against the Board of Regents and the individual defendants in their official capacities is also barred by the Eleventh Amendment.  Keri, 458 F.3d at 641; Fincher v. State of Fla. Dep't of Labor, 798 F.2d 1371, 1372 (11th Cir. 1986) (per curiam).

---

[11] In his response to the motion for summary judgment, Plaintiff argues that he satisfies the elements for a First Amendment retaliation claim.  Doc. 113 at 26.  Suffice it to say that such a claim was never pled.

Moreover, any claim based upon violation of the state constitution is barred.  Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 121 (1984).  Because these claims are barred by the Eleventh Amendment immunity, they must be dismissed for lack of subject matter jurisdiction.  See Frazier v. Simmons, 254 F.3d 1247, 1252 (10th Cir. 2001).

F. § 1983 Claims

Defendants argue that Plaintiff's § 1983 claims are not actionable to the extent that they are premised on a Title VII violation.  Starrett v. Wadley, 876 F.2d 808, 813 (10th Cir. 1989).  Here, Plaintiff's claims allege violation of procedural and substantive due process and equal protection vis-a-vis national origin discrimination under color of state law and injury, and that is sufficient for this analysis notwithstanding the applicability of Title VII.  Id. at 814.

1. Procedural and Substantive Due Process

Defendants are nevertheless entitled to summary judgment on Plaintiff's procedural and substantive due process claims for a number of other reasons.  First, it is undisputed that Plaintiff never availed himself of faculty grievance procedures.  Doc. 107 at 5, ¶ 7; Doc. 113, Ex. B at 415;[12] Doc. 121 at 2 (undisputed fact 7); Doc. 121, Ex. 2A at 69-70.  Although Plaintiff now contends that the procedures apply to only "final

_____

[12]  Plaintiff testified that he expected Human Resources to take action concerning an email he found offensive.  Doc. 113, Ex. B. at 415.  He thought this would include speaking to colleagues and putting the matter to a grievance committee and obtaining a hearing.  Nothing suggests that he ever followed up on such an expectation vis-a-vis utilizing faculty grievance procedures.  Plaintiff's completely subjective expectation is insufficient to create a genuine issue of material fact.

21

administrative decisions" or are otherwise deficient, a plaintiff cannot completely skip the procedure provided and then complain it is inadequate, along with the result.  See Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000); Reilly v. City of Atlantic City, 532 F.3d 216, 235-36 (3d Cir. 2008); Santana v. City of Tulsa, 359 F.3d 1241, 1244 (10th Cir. 2004) ("A party cannot create a due process claim by ignoring established procedures.  'The availability of recourse to a constitutionally sufficient administrative procedure satisfies due process requirements if the complainant merely declines or fails to take advantage of the administrative procedure.'" (quoting Dusanek v. Hannon, 677 F.2d 538, 542-43 (7th Cir. 1982))); McGee v. Boren, 58 F. App'x 436, 438 (10th Cir. 2003) (unpublished)[13] ("Case law firmly establishes that failure to attend a deprivation hearing waives any claims a party might raise about the hearing's inadequacy.").

The court is well aware that § 1983 does not contain an exhaustion requirement. Although Plaintiff maintains that genuine issues of material fact exist concerning whether Plaintiff's complaints were grievable and whether the appeal and review processes were adequate, a due process complaint about the grievance procedure (with absolutely no showing of the specific complaint and the procedure invoked)[14] should not be the remedy of first resort.  Moreover, the Faculty Handbook contains numerous examples of grounds for grievances including perceived inequitable treatment (ranging from salary and

---

[13]  Cited for its persuasive value pursuant to 10th Cir. R. 32.1(A).

[14]  On this record, Plaintiff was hardly reticent, frequently complaining to faculty members and administrators.

professional responsibilities to disputes between faculty), discrimination, and denial of

academic freedom.  Doc. 107, Ex. 14, § V(H)(6)(b).  The contention that the Defendants

somehow delayed making decisions *to deprive Plaintiff of the faculty grievance*

*procedures* is completely speculative and lacking evidentiary support.

Second, the court questions whether Plaintiff, as a tenured professor, has a

substantive due process right in anything other than his continued employment.  The

Tenth Circuit has noted that it is unclear what other property interests in employment

might be protected under substantive due process.  Shrum v. City of Coweta, Okla., 449

F.3d 1132, 1145 (10th Cir. 2006).  Plaintiff relies upon Brenna v. So. Colo. State College,

589 F.2d 475, 476 (10th Cir. 1978), and Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504,

528 (10th Cir. 1998), both of which recognize a property interest in tenured status of

faculty in connection with termination.  The simple fact is that Plaintiff is still a tenured

professor, employed by the university.[15]  The general rule is that a tenured faculty

member has no property interest in reassignment or transfer (including specific teaching

duties) at the same rate of pay.  Hulen v. Yates, 322 F.3d 1229, 1237-41 (10th Cir. 2003).

In Hulen, the Tenth Circuit  recognized a property interest in appointment to a specific

department, but only after an involved analysis of a faculty manual and practice at the

university.  Id. at 1241-44.  No such showing has been made here.  Defendants are

---

[15]  Indeed, the faculty handbook provides that "the terms and conditions of employment []
might change from academic year to academic year, provided that a tenured faculty
member shall NOT be reduced in rank, salary, or length of faculty appointment; except
pursuant to a discharge for cause, a reduction in force subject to guidelines as outlined
elsewhere in this Faculty Handbook or financial exigency."  Doc. 113, Ex. U at 6.5.

entitled to summary judgment on the § 1983 claims based upon procedural and substantive due process.

2.  Equal Protection

Defendants seek summary judgment on the Plaintiff's equal protection claim on the grounds that Plaintiff never established that he was similarly situated and that placing all Defendants in the same group is inappropriate because each had different powers, duties, and interactions with the Plaintiff.  Doc. 107 at 36.  Of course, in a § 1983 action, a plaintiff must show personal participation by each named defendant.  Bryson v. Gonzales, 534 F.3d 1282, 1289 (10th Cir. 2008).  Plaintiff's disparate treatment claims based on national origin are analyzed insofar as the mechanics of proof in the same manner as under Title VII.  Maldonado, 433 F.3d at 1307; Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991).  Plaintiff is not required to satisfy the procedural requirements of Title VII.  CBOCS West, Inc. v. Humphries, 128 S. Ct. 1951, 1959-1960 (2008) (§ 1981 and Title VII); Stuart v. Jefferson County Dep't of Human Resources, 152 F. App'x. 798, 803 (11th Cir. 2005) (unpublished) (§ 1983 and Title VII).  Plaintiff has no claim of retaliation for engaging in conduct protected by Title VII.  Maldonado, 433 F.3d at 1308.  Nor can Plaintiff rely upon a "class of one" theory of equal protection. Engquist v. Ore. Dept. of Agric., 128 S. Ct. 2146, 2156-57 (2008).

The complaint in this matter was filed on April 27, 2007, and the limitation period for Plaintiff's §§ 1983 and 1985(3) claims is three years.  Wilson v. Garcia, 471 U.S. 261, 269 (1985); Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008).  Thus, the

court may consider discrete acts occurring on or after April 27, 2004, and events prior to that time to the extent they are part of a hostile work environment claim.  Bell v. Ohio State Univ., 351 F.3d 240, 247-48 (6th Cir. 2003); Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1172 n.17 (10th Cir. 2007).

A.  Discrete Acts

In arguing that summary judgment should be denied on the equal protection claim, Plaintiff contends that genuine issues of material fact exist as to whether he has been treated differently than other engineering professors based upon his national origin, i.e. "Defendants have refused to pay him a commensurate salary, assign him to engineering classes, and approve his summer contracts."  Doc. 113 at 30 (citing Ex. L, S & O). Plaintiff argues:

> That some engineering professors had different responsibilities or
> obligations does not prevent identifying similarly situated professors,
> especially since many of these additional obligations are often compensated
> through supplemental contracts.  However, a review [of] the base salaries
> alone clearly shows that Plaintiff was treated differently from non-Serbians
> for which there is no rational basis.

Doc. 113 at 30-31.  Of course, on summary judgment, the non-movant must go beyond mere assertions and the allegations in the complaint.

Regarding the salary, Plaintiff essentially invites a review of the department base salaries contained in spreadsheets, which (for 2005-2006) range from $11,340 to $67,948.40.  Doc. 113, Ex. Q, Fiscal Year 2005-2006.  As previously discussed, the court must have some evidence of comparability.  Federal courts are not the place for a review

of compensation decisions without some evidence of comparability.  Even recognizing a

longer limitation period given the § 1983 equal protection claim, the salary data for 2004-

2005 vis-a-vis engineering professors does not suggest a disparity in base salary

detrimental to the Plaintiff.[16]

In his response, Plaintiff also complains that Dr. Greene proposed programs that

would exclude the Plaintiff, that the administration delayed returning the Plaintiff from

administrative leave for a little over three weeks,[17] Doc. 113, Ex. O, yet the Defendants

continued to meet to discuss changes to the engineering curriculum, and that Plaintiff was

assigned to teach non-engineering classes[18] and not perform advisement.[19]  Doc. 113, Ex.

_____

[16]  The fact that Plaintiff was listed as an Associate Professor, rather than a Professor in
the spreadsheets is trivial, and hardly evidence of discrimination, notwithstanding the
suggestion otherwise.  Doc. 113 at 19.

[17]  Plaintiff was placed on administrative leave pending resolution of questions concerning
his grant from the funding agency.  Plaintiff maintains that this was the product of
retaliation under Title VII, a claim rejected above.  Notwithstanding that Plaintiff was
cleared, the delay in returning Plaintiff to work is de minimis.

[18]  Insofar as complaints about teaching assignments, it is undisputed that as of Fall 2005,
there were few engineering courses offered because of demand, and Drs. Tahani (chair)
and Gallegos also taught math classes.  Doc. 107 at 9, ¶ 30; id. Ex. 7 at 53-54.  Plaintiff's
complaint is that the others teach math classes "on the side," and that he is teaching them
"all the time," notwithstanding that he was offered an engineering class to teach, but
rejected it when he was only offered a few hundred dollars to improve lab facilities.  Doc.
113, Ex. B at 345-46.  Plaintiff was scheduled to teach an engineering class this fall.  Doc.
113, Ex. B at 345.

[19]  Dr. Janice Chavez, interim provost, was informed by Dr. Greene that Plaintiff had
informed students that the University had no engineering program and that such a degree
could be obtained elsewhere.  Doc. 113, Ex. K.  At the end of the spring semester, Dr.
Chavez met with students and directed Plaintiff to stop advisement because the
information was inaccurate.  Doc. 107, Ex. 6 at 115-17.  Plaintiff responded that three

L.   The evidence simply does not suggest why any of these events constitute adverse employment actions given that Plaintiff continued to teach at the institution, perform other supplemental tasks, and receive his salary.  In Burlington Indus. v. Ellerth, 524 U.S. 742 (1998), the Court discussed the concept of a tangible employment action that could be adverse—"a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Id. at 761.  While the court liberally construes "adverse employment action," it does not encompass mere inconvenience or alteration of job responsibilities.  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).  Given this equal protection claim, which does not encompass a retaliation claim, the burden is on the Plaintiff to provide evidence of an adverse employment action, let alone that he was intentionally treated differently because of his national origin.  Although Plaintiff appears to contend that every delay, adverse comment, or change of responsibility constitutes an adverse employment action or affects his status as a tenured professor vis-a-vis a hostile work environment claim, see Doc. 113 at 21-24, such is not the case, at least not without some sort of proof.

Plaintiff also points to evidence that Dr. Mendez, the dean of the College of Arts and Sciences, raised questions to Mr. Gomez about whether Plaintiff's 2006 summer

---

other faculty members had met with students and told them that the old engineering program did not exist anymore.  There is an obvious and critical difference between the two messages–the University through the provost certainly has the right to try and attract and retain students and control its message.  Nothing suggests that Dr. Chavez's actions were pretextual, even assuming this rises to an adverse employment action.

27

employment contract at $12,759 overcompensated him.  Dr. Mendez stated: "I continue to be extremely concerned about this kind of an agreement.  I do not know and do not have any control as to what he is doing or what is going on with this grant."  Doc. 113, Ex. S.  Dr. Mendez turned the matter over to his superior, Mr. Gomez.  Doc. 121, Ex. 12A at 92-93, 99-101.[20]  In June 2006, Plaintiff responded twice with details about the summer work to Mr. Gomez and itemized his responsibilities.  In August 2006, Mr. Gomez assured Plaintiff that he would be paid for the work, but that the reports provided were inadequate.  Doc. 113, Ex. S (Gomez email of 8/8/2008, 8:40 am).  Plaintiff was not paid until September 28, 2006.  Plaintiff has not provided any evidence, other than his own sentiment, that the delay in payment was for any reason other than assurance that the amount was properly paid.  See Doc. 113 at 18.  The fact that other administrators may have approved modifications previously does not mean that further review is precluded.  See Doc. 113, Ex. R.  An administrator's decision may not be the best or fairest business judgment, but that is not the issue.  Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001).

Plaintiff also complains that his travel requests were more heavily scrutinized, including requests by Dr. Tahani that Plaintiff provide the names of students that Plaintiff worked with on his grant and other information including the purpose of the travel.  Doc. 107, Ex. 7 at 194; Doc. 113, Ex. B at 267.  Plaintiff thought that this information was

---

[20]  Although this evidence came in the reply brief, it is also addressed in Plaintiff's response, Doc. 113, Ex. P at 103-104, and Plaintiff has not sought leave to file a surreply.

contained elsewhere or unnecessary.  Id.  Defendants contend that they wanted this

information because the funds came from restricted grant funds.  Doc. 107 at 9-10

(undisputed facts 33–36); id. Ex. 7 at 228; see also Doc. 107, Ex. 13 at 125.  Not only is

this an apparently de minimis request, Plaintiff has not shown pretext.  The fact that the

terms of the grant may not require such a listing, or that such information may not be

required in all cases, Doc. 113 at 5 (response to undisputed facts 33 & 34), does not

prevent the institution from requiring it.  The amount of additional corroborative evidence

is plainly within the business judgment of the institution.

　　　　To the extent that Plaintiff complains of other events occurring prior to April 27,

2004, such claims are not actionable.  See Ledbetter, 127 S. Ct. at 2179.  In this regard,

the closing or downsizing of the engineering department in 2002, and the unsuccessful

effort to place Plaintiff at the University of New Mexico in 2003, are discrete acts beyond

the limitations period.  Doc. 113, at 4 (response to undisputed fact 14, 16).

　　　　B.  Hostile Work Environment

　　　　Plaintiff also complains of a hostile work environment.  This requires Plaintiff to

show that the "workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment

and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17,

21 (1993) (quotations omitted).  There is an objective and subjective component to the

inquiry; the Plaintiff must be aware of the conduct complained of and perceive it as

abusive and it must be such that a reasonable person would find the environment hostile

and abusive.  Id. at 21-22.  To evaluate whether a working environment is sufficiently

hostile or abusive, a court looks at the totality of the circumstances, including: (1) the

frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the

conduct is physically threatening or humiliating, or a mere offensive utterance; and (4)

whether the conduct unreasonably interferes with the employee's work performance.  Id.

at 23.  Conduct must be extreme before it amounts to a change in the terms and conditions

of the workplace.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Given the

length of the summary judgment record, it was incumbent on the Plaintiff to specifically

reference which page numbers or email dates, and which exhibits show what and when

(or reference undisputed facts containing the same information).  Adler v. Wal-Mart, 144

F.3d 664, 671 (10th Cir. 1998) (stating that the court "ordinarily limit[s] our review to the

materials adequately brought to [our] attention . . . by the parties"); D.N.M. LR-Civ.

56.1(b).  The court has endeavored to review the summary judgment record to be

factually accurate, but the summary judgment response often makes citation to

voluminous exhibits, without specific references.

In considering a hostile work environment claim on a motion for summary

judgment, the Tenth Circuit has suggested that a court should consider whether (1) the

same hostile work environment is involved, (2) whether one of the acts occurs within the

limitation period and whether those acts stemmed from (in this case) national-origin-

based animus.  Tademy, 520 F.3d at 1156.  The court's next inquiry should be whether

the relevant acts are severe or pervasive.  Id. at 1157, 1161.  Finally, the court should

consider whether the employer's response was adequate.  Id. at 1157, 1164.

In deciding whether the same hostile work environment exists, a court may

consider the type of conduct, frequency, and perpetrator; though this requirement is

flexible depending on the circumstances, and relaxed when the perpetrator is anonymous.

Id. at 1161.  In 2005, the University sought to end its relationship with Plaintiff but

Plaintiff did not accept the University's offer so the University sought to reassign him.

Doc. 113 at 7 (undisputed fact 52); id. at Ex. Y (Chavez email of 4/19/2005, 7:44 pm) ("I

continue to get numerous complaints regarding your behavior towards other faculty, staff

and students and feel it is not in the best interest of the University to keep you in your

current position.").

Starting with events within the three-year limitation period, Plaintiff testified on

deposition that Dr. Rael, interim dean of Arts and Sciences, said on January 20, 2005:

"You Serb . . . have been here for 14 years. You can try somewhere else," and that

Plaintiff was "not compatible with this culture."  Doc. 107, Ex. 2 at 173.  According to

Plaintiff, this was the first time and only time he had a meeting with Dr. Rael, and upon

parting, Dr. Rael made the statement.  Doc. 113, Ex. B at 172-73.  Though Dr. Rael

denied knowing that Plaintiff was Serbian, Plaintiff surmises that because Dr. Rael is a

friend of Dr. Gallegos and Dr. Greene, they must have told him.  Doc. 113, Ex. B at 174.

Plaintiff testified about the remark: "He [Dr. Rael] had dislikes of me, and coincidentally,

I am Serbian."  Doc. 113, Ex. B at 174.  January 2005 is during the time period when the

31

University and the Plaintiff were negotiating the  separation that did not come to pass.[21]

Of course, what matters is Plaintiff's perception of the remark.  Given that Plaintiff

understood this remark as dislike based upon personal characteristics and not national

origin, it is at best weak evidence of a hostile work environment.

Plaintiff also relies upon statements attributed to Dr. Greene.  Plaintiff testified that

he had no contact with Dr. Greene from the Spring of 1998 to the Fall of 2005, as he and

Dr. Greene worked in different departments.  Doc. 107, Ex. 2 at 104.  Dr. Greene was

never Plaintiff's supervisor or dean, and Plaintiff did not answer to him.  Doc. 113, Ex. B

at 342.  Plaintiff contends that Dr. Greene began disparaging him again in 2005 and

"deliberately proposing programs which would exclude Plaintiff."  Doc. 113 at 4

(response to undisputed fact 22).[22]

Plaintiff relies upon emails (obtained in discovery) between Dr. Greene and Dr.

Mendez within the limitations period.  In the process of recruiting Dr. Gallegos, Dr.

Greene indicated that Dr. Gallegos was "a keeper if we can hook him and deal with an

---

[21] Dr. Rael and Plaintiff had clashed when Plaintiff was reprimanded for interfering in administrative decisions.  The directive was precipitated by Plaintiff emailing a missive objecting to the hire of an engineering technician.  Doc. 107 at 7 (undisputed facts 19-21); id. Exs. 3, 4.  This prompted the interim provost to inquire about a psychological evaluation for the Plaintiff based on her concern that he was "stressed out."  Doc. 107 at 7 (undisputed fact 21).

[22] Although Plaintiff contends elsewhere that "[t]he harassment did not stop even though the Plaintiff and Greene ceased to work in the same department after approximately 1998," Plaintiff then cites Exhibits B, C, D, E, F.  Doc. 113 at 25.  The court will not sort through hundreds of pages of deposition testimony and exhibits looking for material that may or may not support this proposition.

unsettled Zrilic."  Doc. 113, Ex. D (Greene email of 8/20/2005, 4:51 pm).  In another

email Dr. Greene also advocated a 3/2 engineering program and then commented that

apparently the current program "was politically and ethnically driven during the last 2

years and convoluted by negative personnel matters–a reflection of the university in

general."  Doc. 113, Ex. D (Greene email of 7/14/2005, 10:26 am).  The email also

advised that there should be one faculty member to take ownership of the program and

parenthetically noted that "Zrilic is absent in the report."  Id.  To the extent Plaintiff was

not the recipient of this internal conversation, Plaintiff may only rely upon conduct of

which he was aware in establishing a hostile work environment claim.  Hirase-Doi v. U.S.

West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995).  Moreover, even in the

light most favorable to the Plaintiff, these e-mails do not contain the type of offensive

slurs based upon national origin that might contribute to a hostile work environment.  See

Amirmokri v. Baltimore Gas and Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (group

leader and co-workers abused Plaintiff daily with slurs based on national origin; group

leader tried to embarrass him and undermine Plaintiff in front of co-workers).

     Plaintiff also relies on three emails or comments in which Dr. Greene expresses his

dislike for Plaintiff, suggests he is "not well," and makes derogatory comments about

Plaintiff's effect on others.  Doc. 113, Ex. B at 414; id. Ex. K (Greene email of 8/23/2006,

8:43 am); id. Ex. X (Greene email of 9/23/2005; 9:45 am).  Two of the three are internal

emails which indicate that Plaintiff was not the recipient.  While these emails are unkind

and unprofessional and plainly convey that Dr. Greene does not like the Plaintiff, they too

simply are not the type of comments that suggest a hostile work environment based upon national origin.

Plaintiff also relies upon Dr. Greene's advocacy and lobbying for a 3/2 engineering program.  It is apparent on this record that Plaintiff and Dr. Greene had very different ideas about such a program and how it should be staffed, but the mere expression of opinions on the curriculum does not make a hostile work environment, even if the opinion suggests that certain personnel should be utilized differently or not at all. Plaintiff simply lacks significantly probative evidence that every decision in the academic environment that he disliked was a product of Dr. Greene's allegedly discriminatory animus–nor is it plausible given the decentralized nature of a university.

Plaintiff claims the following are evidence of a hostile work environment: (1) late approval of his summer contract, (2) teaching assignments, (3) precluding him from advising engineering students, (4) based on spurious claims that students complained, (5) denial of a salary increase for 2005/2006 commensurate with similarly situated professors, and (6) isolation from other professors and deprivation of lab facilities.  Doc. 113 at 22-23.  None of these have been linked with overt discriminatory animus based on national origin, but to the extent they may be considered in a hostile work environment claim, the summary judgment evidence suggests that (1) more than one administrator had questions about payment, (2) others in the department taught math classes and Plaintiff rejected teaching an Engineering class, (3)-(4) precluding the Plaintiff from advising Engineering students was certainly a prerogative of the institution given the reports and

investigation of the matter beforehand, (5) Plaintiff did not prove he was similarly situated concerning the 2005-2006 raise, and (6) the summary judgment evidence simply does not establish that the state of the equipment in the engineering program or the provision of office space could have been the product of discriminatory animus.  See Doc. 113 at 6 (undisputed fact 51) (citing Ex. W).

The court recognizes that acts outside the three-year limitation period may also be considered to the extent that they are part of the same hostile work environment claim. Morgan, 536 U.S. at 117-118.  The essence of Plaintiff's hostile work environment claim is that he was subjected to national origin discrimination in an effort to force him out of the University.  It is undisputed that from 1993-1997, Dr. Greene and Dr. Taylor were the only ones that Plaintiff contends made derogatory comments about his national origin. Doc. 107 at 4 (undisputed fact 5).  According to the Plaintiff, over a period of years he was called a "crazy Serb," "cousin of Milosevic," a "communist spy" and Dr. Greene allegedly told him he was not compatible with the country.  Doc. 107 at 4 (undisputed fact 4).  Although Plaintiff responds that such remarks were made to others, Doc. 113 at 3 (response to undisputed fact 4), his perception is what matters.  One witness indicated that over a span of two-and-a-half years Dr. Greene made "crazy Serb" comments a handful of times, and Plaintiff was present about half of those times, yet after 1998, Plaintiff could only identify one hearsay statement (not admissible) about the "crazy Serb" comment. Doc. 113 Ex. E at 28-29; Ex. B at 307.  Plaintiff also indicated in 1998 that someone left a memo in his office from Dr. Greene to Dr. Taylor that read (at the bottom) "Slavic

35

languages are going to overshadow English/Spanish.  How odd."  Doc. 107 at 4

(undisputed fact 3).

Even in the light most favorable to the Plaintiff, the summary judgment evidence

falls short of establishing a hostile work environment under the standard set forth by the

Supreme Court in Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), and applied

by the Tenth Circuit in Bolden v. PRC, Inc., 43 F.3d 545, 550-51 (10th Cir. 1994).

Plaintiff was required to show, based upon the totality of the circumstances, that the

harassment was so pervasive or severe that it altered the terms, conditions, or privileges

of employment.  Id. at 551 (citing Meritor, 477 U.S. at 67).  It is not sufficient to show

that there was general harassment in the absence of severe or pervasive harassment based

on national origin.  Witt v. Roadway Express, 136 F.3d 1424, 1432-33 (10th Cir. 1998).

Indeed, the Tenth Circuit has stated that sporadic racial slurs would not suffice to show a

hostile work environment; instead, there must be a "steady barrage of racial comments."

Bolden, 43 F.3d at 551 (citing Hicks v. Gates Rubber Co., 833 F.2d 1406, 1412 (10th Cir.

1987)).  Without discussing every item of evidence, it is apparent that Plaintiff only

proffers evidence that he was subjected to occasional offensive remarks based upon

national origin and that others may have heard the remarks.  Dr. Rael's 2005 statement to

Plaintiff which included a reference to national origin was an isolated statement which

Plaintiff understood to be based on personal characteristics rather than national origin.

Nor do the other employment actions complained of suggest national origin

discrimination.  Looking at the totality of the circumstances, the Plaintiff has not carried

36

his burden of showing severe or pervasive harassment that altered the terms and conditions of his employment.

The summary judgment evidence suggests an environment rife with conflict that was at times unprofessional and unpleasant. Plaintiff was in an academic area (engineering) with low enrollment, was perceived to be difficult, and there were a variety of views about what should be done in the department. To the extent that Plaintiff is suggesting that other faculty members, administrators, and/or the Board of Regents are not allowed to engage in dialogue that may adversely affect his program and its personnel, he is surely wrong. Regardless, there is not sufficient evidence of a "steady barrage" of "opprobrious" comments based on national origin to sustain a hostile work environment claim in this case. See id. Federal employment laws, let alone the Equal Protection Clause, are not intended to displace internal dialogue about academic programs, nor remedy mean-spiritedness in the workplace. Faragher, 524 U.S. at 788 (stating that the court's standards must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"). Rather, they only reach those instances of harassment that are based on discriminatory animus. Here, the evidence presented, taken in the light most favorable to the Plaintiff and ignoring the Defendants' frustration with the Plaintiff, only shows that certain Defendants may have created an unpleasant environment; it does not show that they had created a hostile work environment that is legally redressable. See Bolden, 43 F.3d at 551 (holding that there was no showing of severe or pervasive conduct where the plaintiff had failed to present enough evidence to

show that the harassment was racial); <u>Bloomer v. United Parcel Service, Inc.</u>, 94 F. App'x 820, 825 (10th Cir. 2004) (unpublished) (finding that there was no showing of severe or pervasive conduct where the plaintiff only alleged isolated acts separated by months or years involving different conduct and people). Accordingly, the Plaintiff's hostile work environment claims based on equal protection are insufficient to survive summary judgment.

G. § 1985(3) Claim

Defendants contend that the § 1985(3) should be dismissed because Title VII is an exclusive remedy and preempts a § 1985(3) claim given the same evidence. This is meritless; even though the evidence might be identical and § 1985(3) requires a conspiracy and class-based discriminatory animus, the § 1985(3) claim is based on the denial of equal protection, a constitutional right. <u>Dickerson v. Alachua County Comm'n</u>, 200 F.3d 761, 766-67 (11th Cir. 2000). Defendants contend that it is questionable whether discrimination based on national origin can form the basis of such a claim; however, the Tenth Circuit has allowed such claims to be pled. <u>Martinez v. Winner</u>, 771 F.2d 424, 440 (10th Cir. 1985).

A § 1985(3) claim requires the Plaintiff to show (1) a conspiracy, (2) to deprive the Plaintiff of equal protection, or equal privileges and immunities, (3) an act in furtherance of the conspiracy, and (4) a resulting injury or deprivation. <u>Tilton v. Richardson</u>, 6 F.3d 683, 686 (10th Cir. 1993). Given the court's resolution of the equal protection claim and

lack of evidence (or explanation) suggesting an agreement and class-based discriminatory animus, summary judgment on this claim should be granted.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that Defendants' Motion for Summary Judgment filed June 30, 2008 (Doc. 107) is granted. A judgment will be entered accordingly.

DATED this 22nd day of September 2008, at Santa Fe, New Mexico.


_____
United States Circuit Judge
Sitting by Designation

Counsel:

Charlotte H. Hetherington and Kristin L. Davidson, Scheuer, Yost & Patterson, P.C., Santa Fe, New Mexico, for Plaintiff.

Michelle Lalley Blake, French & Associates, P.C., Albuquerque, New Mexico, for Defendants.